# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

KAREN BARNETT,                          :

     Plaintiff,                        :
                                   Case No. 3:14cv003

vs.                                     :

                                   District Judge Thomas M. Rose

CAROLYN COLVIN,                         :    Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,                :

     Defendant.                        :

# REPORT AND RECOMMENDATIONS[1]

## I.     INTRODUCTION

After many years of employment, Plaintiff Karen Barnett sought financial

assistance from the Social Security Administration by applying for Disability Insurance

Benefits.  She asserted that she had been under a benefits-qualifying disability beginning

on January 19, 2010.  Her health problems include fibromyalgia, degenerative arthritis,

and depression.  (*PageID#* 160).

 After various administrative proceedings, Administrative Law Judge (ALJ)

Theodore W. Grippo, denied Plaintiff's application, concluding that despite her

impairments, she retained the ability to perform her last job and, consequently, she did not

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

suffer from a benefits-qualifying "disability." (*PageID##* 38-52).  ALJ Grippo reasoned, in the main, that Plaintiff's descriptions of her impairments and limitations lacked credibility.  ALJ Grippo also favored the opinions of non-treating medical sources about Plaintiff's impairments and limitations over the opinions of her treating medical sources.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #12), Plaintiff's Reply (Doc. #15), the administrative record (Doc. #6), and the record as a whole.

## II. BACKGROUND

### A. <u>Plaintiff's Vocational Profile and Testimony</u>

Plaintiff was 51 years old at the time of her administrative hearing and is thus considered a "person closely approaching advanced age" for the purpose of resolving her application for benefits.  *See* 20 C.F.R. §404.1563(c).  She has a high school education and worked for many years as an order clerk.

During the ALJ's hearing, Plaintiff testified that she lives in a house with her husband.  After 11 years of employment as an order clerk, a job she loved,  she stopped working in January 2010 because it was "too painful, sitting." (*PageID##* 67-68).  She stated that she experiences pain "all over." (*PageID#* 69).  Some days her pain is a little better than other days.  She typically has much worse pain 3 to 4 days each week.  Her pain intensifies when she must go somewhere, like to a doctor's appointment.  On bad pain days, she tries to get comfortable in bed or rest in her recliner with her feet raised to

2

waist level.  On very bad days, she will spend all day in bed.

On good days, she has less pain and tries to do things at home like light dusting or folding laundry or making tv dinners.  Still, on these good days, she will last "maybe half-hour at most," then she needs to rest.  (*PageID*# 71).  She will typically spend the day resting for one-half hour then getting up for one-half hour.

Plaintiff also testified about suffering from depression in part due to her son's death in 2002.  He died at age 22 in a skateboarding accident.  (*PageID*## 337, 361).  Plaintiff's depression definitely worsened after her son died.  During the ALJ's hearing, when Plaintiff was asked how depression affects her, she began crying and stated, "I just don't want to – I don't know.  I just can't go.  I just ache." *Id*.  She has crying spells every day, sometimes a few times a day.  During a crying spell, she usually will sit on the bed by herself and cry.  Plaintiff acknowledged having problems with concentration and attention because she often thinks of her son.

Plaintiff testified that she no longer has friends.  She only leaves her house to go to doctor appointments or trips to the grocery store with her husband.  Going shopping increases her pain, so she avoids going there more than 1 to 2 times per month.

Plaintiff estimated that she could sit in a chair for 15 minutes but then would need to stand up.  She could not stand in one place because her head hurts; she could stand for about 10 or 15 minutes.  She feels that she could walk approximately a block before needing to sit down.  She could lift about 5 pounds.

**B.**    **Medical Records and Opinions:  Physical Impairments**

**1.**    **J. Michael Thuney, M.D.**

Dr. Thuney, a primary care physician, began treating Plaintiff in 1999, if not earlier.  (*PageID*# 338).

On February 26, 2009, Plaintiff told Dr. Thuney she had low back pain radiating into her right leg.  Dr. Thuney noted Plaintiff's medications, recorded "multiple tender spots," noted diagnoses of lumbar degenerative disc disease and fibromyalgia.  (*PageID*# 251).  In January 2010, Dr. Thuney noted that Plaintiff was not "exercising regularly." (*PageID*# 249).  Dr. Thuney examined Plaintiff in February 2010, finding diffuse tenderness in her para-cervical region.  (*PageID*# 248).

In a letter dated May 21, 2010, Dr. Thuney reported that in January 2010, Plaintiff had poorly controlled hypertension.  He saw Plaintiff in February 2010 for "persistent fibromyalgia."  (*PageID*# 301).  Plaintiff felt the stress of work was exacerbating her conditions.  She described daily generalized muscular pain that makes it difficult for her to focus and concentrate.  She is physically uncomfortable despite the increases in her medication.  Dr. Thuney wrote, "It is my opinion that the above diagnoses are a significant disability for Ms. Barnett.  She is unable to work and will be for the foreseeable future."  *Id*.

When seen on June 21, 2010, Plaintiff complained of "worse pain."  (*PageID*# 298).  Dr. Thuney diagnosed fibromyalgia, depression, and chronic pain syndrome and

prescribed Vicodin.  *Id*.  In January 2011, Plaintiff was tender in her bilateral upper extremities.  (*PageID*# 308).

On May 23, 2011, Dr. Thuney completed a medical statement regarding fibromyalgia.  (*PageID*## 341-42).  Dr. Thuney noted Plaintiff's history of widespread pain, pain in 11 or more pressure points, stiffness, paresthesia in her hands, swelling sensation in her extremities, chronic fatigue, sleep disturbance, and memory loss. (*PageID*# 341).  According to Dr. Thuney, Plaintiff cannot work any hours in an 8-hour workday; she can sit or stand for 15 minutes at a time; and she could occasionally lift up to 5 pounds.  He further opined that Plaintiff could never stoop and could occasionally bend and raise her arms.  Dr. Thuney further noted that Plaintiff's pain is severe and significantly aggravated by her depressive and anxiety symptoms.  Dr. Thuney opined that Plaintiff is "not able to work."  *Id*.  Dr. Thuney concluded that Plaintiff is not capable of withstanding the stresses and pressures of ordinary work activity.  Dr. Tunney explained that Plaintiff's "situation is chronic/stable unrelenting despite meds ...."  (*PageID*# 342).

On January 5, 2012, Plaintiff reported diffuse pain and depression.  Dr. Thuney recorded, in his treatment notes, that Plaintiff had 18 of 18 tender spots in her back, head, bilateral upper extremities, and bilateral lower extremities.  Dr. Thuney's diagnoses remained fibromyalgia.  (*PageID*# 394).

### 2.    Robert Schriber, M.D.

Plaintiff was initially seen by rheumatologist, Dr. Schriber on referral from Dr.

5

Thuney, on March 3, 2009. After examining Plaintiff, Dr. Schriber opined that he did not believe that Plaintiff was suffering from rheumatoid arthritis or any other inflammatory type illness. He suspected "a functional component to her symptoms (fibromyalgia syndrome)." Dr. Schriber recommended exercise, smoking cessation, and a low dose of Elavil in the evening. (*PageID*# 253).

Plaintiff underwent a whole body bone scan on April 3, 2009, which showed "minimal arthritis changes" and was considered normal. (*PageID*## 235-36). An EMG was negative for neuropathy, radiculopathy, plexopathy, neuropathy, or any other type of nerve injury. (*PageID*## 256-57). A lumbar spine taken on May 2, 2009, revealed minimal disc protrusions at L4-L5 and L5-S1. (*PageID*# 238).

On March 8, 2010, Dr. Schriber opined that the severity of Plaintiff's conditions did not meet one of the disability listings for the musculoskeletal system and he noted that he had not seen Plaintiff since May 2009. (*PageID*# 255).

### 3. Leslie Greene, M.D.

State agency physician Dr. Greene reviewed Plaintiff's records in May 2010. (*PageID*## 288-95). Dr. Green determined that Plaintiff could lift/carry/push/pull 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 6 hours; and sit for 6 hours. (*PageID*# 289). Dr. Green also found that Plaintiff could never climb ladders, ropes, or scaffolds; and could frequently stoop, crouch, crawl, and climb ramps and stairs. (*PageID*# 290).

6

### C.     Mental Health Records and Opinions

Plaintiff sought mental health treatment at Darke County Mental Health on August 16, 2010.  (*PageID*## 302-07).  She reported that she had been depressed since 2002 when her son died.  She suffered from not sleeping, sad moods, low motivation, lack of energy, and decreased appetite.  (*PageID*# 302).  She explained that she worried about everything and had daily thoughts of suicide.  *Id*.  On mental status examination, Plaintiff was depressed with an anxious mood.  (*PageID*# 307).  The intake social worker diagnosed Plaintiff with major depressive disorder and generalized anxiety disorder.  (*PageID*# 304).  She was assigned a Global Assessment of Functioning (GAF) score 53.[2] *Id.*

Plaintiff returned to mental health treatment in August 2011.  (*PageID*# 389).  In September 2011, she underwent a diagnostic assessment in which she reported that she had no desire to do anything, did not sleep, and cried over nothing.  She no longer saw any of her former friends.  (*PageID*# 378).  Her mood was depressed.  (*PageID*# 375).

Plaintiff was initially evaluated by psychiatrist, Dr. Dahar, in October 2011.  (*PageID*## 361-66).  Plaintiff reported feeling anxious most of the time, sleeping very little, and feeling significantly depressed.  (*PageID*# 361).  On mental status examination,

---

[2] In 2010, health-care professionals estimated a person's Global Assessment Functioning in the areas of psychological, social, and occupational functioning on a hypothetical continuum of mental illness. *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision (DSM-IV-TR) at 32-34. The current DSM edition rejects GAF as a useful diagnostic/treatment tool.

Dr. Dahar found Plaintiff's psychomotor activity was slowed, her mood was depressed/anxious, and her behavior was withdrawn.  (*PageID#* 362).  Dr. Dahar diagnosed dysthymic disorder and generalized anxiety disorder.  (*PageID#* 363).

Plaintiff continued to receive counseling and medication/somatic treatment with Dr. Dahar through at least March 2012.  (*PageID##* 343-89, 395-407).  She generally reported struggling with racing thoughts and limited sleep.  *Id.*

On January 6, 2012, Dr. Dahar identified Plaintiff's diagnoses as dysthymic disorder and generalized anxiety disorder.  (*PageID#* 390).  He noted that Plaintiff suffered from sleep disturbance, social isolation, anhedonia, feelings of worthlessness, persistent anxiety, and severely decreased energy.  *Id.*  He observed that Plaintiff's "inability to work makes her depressed/anxious which makes [her] pain increase." (*PageID#* 392).

Dr. Dahar anticipated that Plaintiff would miss work more than 3 times per month. *Id.*  He opined that Plaintiff's impairments impose marked limitations in her activities of daily living, social functioning, and concentration, persistence, or pace.  *Id*  Plaintiff was markedly limited in her abilities to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and sustain an ordinary work routine without special supervision, according to Dr. Dahar.  (*PageID##* 392-93).

Psychologist Dr. Boerger examined Plaintiff in April 2010 on behalf of the state agency.  (*PageID##* 265-69).  Plaintiff drove herself to the evaluation and came alone.

8

(*PageID*# 265). On mental status examination, Plaintiff was clean and cooperative.

(*PageID*# 266). Her speech was normal. Her affect was appropriate to the situation. She

reported that she was significantly depressed related to the death of her son and

experienced crying spells on a daily basis. (*PageID*# 267). She also reported mood

swings, poor sleep, feelings of hopelessness "'all the time,'" no energy, and diminished

interest in daily activities. *Id*. She explained that she'd had trouble with anxiety since her

son died. She experienced panic attacks, feeling her heart pound and "she cannot

breathe." *Id*. She explained that she thinks a lot about her son and has difficulty thinking

of anything else. *Id.*

As to her activities of daily living, Plaintiff reported that she "sometimes doesn't

bother getting dressed," neglects her hobbies, cooks only "quick and easy" meals, cleans

her home, manages her money, and drives. (*PageID*# 268). She got along with people in

stores as long as she "gets in and out quickly." *Id.*

Dr. Boerger diagnosed dysthymic disorder and panic disorder with agoraphobia.

(*PageID*# 269). He opined that Plaintiff had no impairment in understanding and

following instructions, mild impairment in relating to others, mild impairment in

maintaining attention to perform simple repetitive tasks, and moderate impairment in

withstanding the stress and pressure of work activity. (*PageID*# 269).

Dr. Semmelman, a record-reviewing psychologist, indicated in April 2010 that

Plaintiff had a mild restriction in her daily activities and social functioning; moderate

9

difficulties in maintaining concentration, persistence, or pace; and no episodes of decomposition. (*PageID* # 284). Dr. Semmelman believed that Plaintiff was moderately restricted in her ability to (1) maintain attention and concentration for extended periods, (2) complete a normal workday or workweek without interruptions from psychologically based symptoms, and (3) perform at a consistent pace without an unreasonable number and length of rest periods. (*PageID* ## 270-71). Dr. Semmelman concluded that Plaintiff retained the ability to complete simple and multi-step tasks without strict time or production demands. She could interact with co-workers, supervisors, and the public without limitation. (*PageID* # 272).

## III.  ADMINISTRATIVE REVIEW

The Social Security Administration provides Disability Insurance Benefits (DIB) to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §423(a)(1)(D). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job – *i.e.,* "substantial gainful activity," in Social Security lexicon.[3] 42 U.S.C. §423(d)(1)(A); *see Bowen*, 476 U.S. at 469-70.

Social Security Regulations required ALJ Grippo to resolve Plaintiff's DIB

---

[3] In addition, the impairment must be one "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423.

application through a five-step sequential evaluation of the evidence.  20 C.F.R. §404.1520(a)(4); *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  During this evaluation, a dispositive finding at any step of the sequential evaluation would terminate the ALJ's review.  *Colvin*, 475 F.3d at 730.  This occurred – in ALJ Grippo's view – at step 4 where he concluded that Plaintiff could perform her past relevant work as an order clerk.

When reaching this conclusion at step 4, ALJ Grippo first evaluated Plaintiff's residual functional capacity.  He found that she could perform light work except she could never climb ladders, ropes, or scaffolds.  ALJ Grippo also found that Plaintiff could "frequently stoop, crouch, crawl, and climb ramps and stairs." (*PageID* # 46).  And the ALJ concluded that Plaintiff could "perform simple and multi-step tasks without strict time or production quotas." (*PageID* # 46).

The ALJ noted that, based on Plaintiff's description, her job as an order clerk "was performed in the sedentary range, involving taking orders over the telephone and entering them in a computer, lifting less than 10 pounds, sitting for 8 or more hours per day, and writing, typing or handling small objects for 8 hours a day." (*PageID* ## 51-52).  The ALJ also referred to the vocational expert's testimony that Plaintiff's past relevant work as an order clerk was "semiskilled" and "sedentary" both as Plaintiff described it and as defined by the Dictionary of Occupational Titles.  *Id*. at 52.  The ALJ then returned to his assessment of her residual functional capacity and concluded that Plaintiff could perform

her past relevant work as an order clerk.

This dispositive finding ended the ALJ's sequential evaluation at step 4, and resulted in his non-disability conclusion. The ALJ did not make alternative findings at step 5. (*PageID# 52*).

## IV.  JUDICIAL REVIEW

The Social Security Administration's determination of disability – here, embodied in ALJ's Grippo's decision – is subject to judicial review along two lines: whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's findings. *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see Bowen v. Comm'r of Social Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007). Reviewing the ALJ's legal criteria for correctness may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Social Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.

The substantial-evidence review does not ask whether the Court agrees or disagrees with the ALJ's factual findings or whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Social. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, substantial evidence supports the ALJ's factual findings when "a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 406 (quoting *Warner v. Comm'r of Social Sec.*, 375

F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

## V. DISCUSSION

### A. The Parties' Main Contentions

Plaintiff asserts a total of five main errors, the first three of which are:

1. The ALJ erred in rejecting the opinions of Plaintiff's treating physicians;

2. The ALJ was unreasonable in relying upon the assessment of the state agency's non-examining consultants; [and]

3. The ALJ's findings regarding Plaintiff's daily activities are unreasonable and contrary to the evidence[.]

(Doc. #8 at *PageID*# 420).

The Commissioner contends that the ALJ properly weighed the opinions of treating physician Dr. Thuney and treating psychiatrist Dr. Dahar and properly gave significant weight to record-reviewing sources Drs. Greene and Semmelman. The Commissioner further contends, "[T]he ALJ considered that while Plaintiff reported diminished activities at the hearing, she described a relatively wide range of activities in the record and Plaintiff's arguments to the contrary lack merit." (Doc. #12 at *PageID*# 445).

### B. Credibility

The ALJ's assessment of Plaintiff's credibility played a key role in the little weight he placed on the treating sources' opinions (Drs. Thuney and Dahar), and in the great

13

weight he placed on the non-treating sources' opinions (Drs. Semmelman, Greene, and

Boerger), and in his assessment of Plaintiff's residual functional capacity.  In this manner,

the ALJ's credibility assessment became the linchpin of his conclusion that Plaintiff could

perform her past relevant work as an order clerk.  The ALJ explained:

> In assessing credibility, the undersigned first considers the claimant's activities of daily living.  Although the claimant reported diminished activities of daily living at the hearing, she described a relatively wide range of activities in the record.  In her Function Reports, the claimant reported being able to prepare meals, perform all personal care tasks, clean her home, do the laundry, drive an automobile, manage money, and shop in stores weekly for 45 minutes at a time.  The claimant also reported sewing occasionally and walking on her treadmill for 10 to 15 minutes.  Furthermore..., the claimant told the mental consultative examiner [Dr. Boerger] that she could clean her home, prepare simple meals, manage her money, and drive an automobile.  As to social functioning, the claimant stated that she got along well with people in stores and spent time visiting with her son.  Overall, the activities of daily living reported by the claimant in the record show a level of functioning consistent with the above limited light residual functional capacity.

(*PageID*## 47-48).  The ALJ also relied on Plaintiff's daily activities as a reason to credit

the non-treating sources' opinions, explaining:

> After careful consideration of the entire record, the undersigned gives the opinions of Drs. Greene, Semmelman, and Boerger great weight.  The opinions are consistent with the wide range of daily activities reported by the claimant in the record, including preparing meals, performing all personal care tasks, cleaning her home, do[ing] the laundry, driving an automobile, managing her money, shop[ping] in stores weekly.  The undersigned notes that the claimant told Dr. Boerger that she got along with people in stores and spent time visiting with her son. The opinions are consistent with the claimant's GAF scores, which have consistently been in the moderate range from 53 to 57....

(*PageID*# 50).  Plaintiff's daily activities similarly impacted the ALJ's decision to

14

discount treating physician Dr. Thuney's opinions, finding them "contradicted by the claimant's report of daily activities ...." (*PageID#* at 51).  And, the ALJ gave little weight to Plaintiff's psychiatrist Dr. Dahar's opinions by concluding his opinions are "inconsistent with the claimant's reported activities of daily living, such as preparing meals, performing all personal care tasks, cleaning her home, do[ing] the laundry, driving an automobile, managing money, shop[ping] in stores weekly." *Id*.

Upon judicial review, an ALJ's credibility determinations are generally entitled to deference:

> It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.  However, the ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility."  Soc. Sec. Rul. 96–7p, 1996 WL 374186, at * 4.  Rather, such determinations must find support in the record.  Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record."  The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record.  Consistency of the various pieces of information contained in the record should be scrutinized.  Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect.

*Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 247-48 (6th Cir. 2007) (internal citations omitted).

The ALJ's finding of inconsistencies of Plaintiff's descriptions of her daily

activities finds no evidentiary support in the record.  The ALJ compared Plaintiff's testimony during the administrative hearing to the information she provided about her daily activities in her "Function Reports."  But the ALJ overlooked or ignored that the activities Plaintiff listed in the Function Report are limited and, therefore, consistent with her hearing testimony.  *See PageID*## 178-79.  Plaintiff reported, for instance, she only did "some cleaning, laundry, and cooking." (*PageID*# 178).  She cooked daily but cooked "soups, sandwiches, [and] frozen dinners." (PageID# 77).  Her cooking only lasted ½ hour  because, she explained, "I can't stand too long at stove, so I make quick things." *Id*.  This was consistent with her hearing testimony about limited activities on her "good" days when her pain level was better. (*PageID*## 70-71, 77).

As to cleaning or doing laundry, Plaintiff testified that she tried "to do stuff at home..., like light dusting or my husband does the laundry but I might fold the laundry." (*PageID*# 70).  This is not inconsistent with her statement in the Function Report that she did "some" cleaning and laundry and is consistent with her other testimony that on a typical day, she could "just about" be up for ½ hour, then needed to sit in a recliner for ½ hour, then up ½ hour all day long. (*PageID*# 71).  In addition, her abilities to handle money, drive a car, and engage in personal care (which takes her ½ hour) as indicated in her Function Report, is not inconsistent with any of her testimony because she was not asked, and therefore did not testify, about her abilities to do these activities.  As to sewing, Plaintiff indicated in her Function Report that this was her hobby but she "hardly

never" did any sewing because she could not sit for long." (*PageID#* 179).  The ALJ overlooked this limitation when relying on "sewing" as an inconsistency.  And, although Plaintiff stated that she went grocery shopping once a week for 45 minutes, this is not so different from her ability to be up for "just about" ½ hour to support the ALJ's overall finding that Plaintiff's testimony was inconsistent with her function report, particularly when the other inconsistencies he identified do not exist.

The ALJ, moreover, misunderstood that the other Function Report in the record was not completed by Plaintiff but was a "Function Report Adult Third Party" (*PageID#* 191).  The third party who completed this Function Report was Plaintiff's Aunt.  *Id*.  The fact that the ALJ misunderstood this does not inspire confidence that he carefully reviewed the evidence, as he indicated.  (*PageID#* 47).  More significantly, Plaintiff's Aunt described limitations consistent with Plaintiff's testimony.  According to her Aunt, Plaintiff cooks soups and tv dinners, she does only "light cleaning," she can't sew anymore because she can't sit or stand long because she is in too much pain.  (PageID## 191-98).

Social security regulations direct that a clamant's mental health impairments and related functional limitations are measured in light of the ability to perform activities on a "sustained basis," not intermittently or expectantly.  20 C.F.R. §404.1520a(c)(3).  This is notably applicable in the present case where Plaintiff's allegations and the assessment of her treating providers document her fluctuating moods and abilities, and her good versus

17

bad pain days. Given these variations in her mental health symptoms and pain levels, there is no inconsistency between her daily activities and her treating providers' opinions about her limited work abilities. *See Gayheart v. Comm'r Social Sec.*, 710 F.3d 365, 377 (6th Cir. 2013) ("These activities [leaving home, driving, keeping appointments, visiting friends and neighbors, shopping] would be relevant if they suggested that Gayheart could do something on a sustained basis that is inconsistent with [her treating source's] opinions. But they do not.").

The ALJ also relied on the daily activities Plaintiff discussed with Dr. Boerger during his one-time evaluation. Examination of Dr. Boerger's report, however, indicates that the daily activities Plaintiff described to Dr. Boerger are consistent with her testimony, her Function Report, and her Aunt's Function Report. (*PageID#* 267). In addition, Dr. Boerger noted, under the heading "Family History" that she was a "good historian." (*PageID#* 265). Dr. Boerger did not otherwise indicate that he found Plaintiff to lack credibility. (*PageID##* 265-69).

Accordingly, Plaintiff's challenges to the ALJ's credibility assessment are well taken.

### C.     Medical Source Opinions

The parties' dispute over the ALJ's evaluation of the medical-source opinions of record focus on the little weight he placed on treating physician Dr. Thuney's opinions and treating psychiatrist Dr. Dahar's opinions and on the great weight he placed on the

18

opinions of non-treaters Drs. Greene, Semmelman, and Boerger.

Social Security Regulations recognize several different categories of medical

sources: treating physicians, nontreating yet examining physicians, and nontreating

record-reviewing physicians.  *Gayheart*, 710 F.3d at 375.

> As a general matter, an opinion from a medical source who has
> examined a claimant is given more weight than that from a source who has
> not performed an examination (a "nonexamining source"), and an opinion
> from a medical source who regularly treats the claimant (a "treating
> source") is afforded more weight than that from a source who has examined
> the claimant but does not have an ongoing treatment relationship (a
> "nontreating source"). In other words, "[t]he regulations provide
> progressively more rigorous tests for weighing opinions as the ties between
> the source of the opinion and the individual become weaker." Soc. Sec. Rul.
> No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Gayheart*, 710 F.3d at 375 (citing, in part, 20 C.F.R. §404.1527(c)(1), (d) (eff. April 1,

2012)).

A treating source's opinion is given controlling weight under the treating-

physician rule when it is both well supported by medically acceptable data and not

inconsistent with other substantial evidence of record.  *Gayheart*, 710 F.3d  at 376; *see* 20

C.F.R. §404.1527(c)(2) (eff. April 1, 2012); Soc. Sec. Ruling 96-2P, 1996 WL 374188 at

*1 (July 2, 1996).  "If the Commissioner does not give a treating-source opinion

controlling weight, then the opinion is weighed based on the length, frequency, nature,

and extent of the treatment relationship, as well as the treating source's area of specialty

and the degree to which the opinion is consistent with the record as a whole and is

supported by relevant evidence."  *Gayheart*, 710 F.3d at 376 (citation omitted).

19

Unlike treating physicians, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'  The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling.  Other facts 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion." *Id*. (citing 20 C.F.R. § 404.1527(c)(6) (eff. April 1, 2012)).

The ALJ placed great weight on the opinions of Drs. Greene, Semmelman, and Boerger, first explaining, "The opinions are consistent with the wide range of activities of daily living reported by the claimant in the record, including preparing meals, performing all personal care tasks, cleaning her home, do[ing] the laundry, driving an automobile, managing her money, and shop[ing] in stores weekly." (*PageID*# 50).  As previously explained in detailed, substantial evidence does not support the ALJ's finding that Plaintiff engaged in a "wide range" of daily activities, *see supra*, §V(B), and does not support the ALJ's reliance on certain daily activities – personal care, house cleaning, laundry, weekly shopping, and managing money – when accepting the non-treating sources' opinions.  The ALJ also accepted the non-treating sources' opinions because Plaintiff "told Dr. Boerger that she got along well with people in stores and spent time visiting with her son." (*PageID*# 50).  Contrary to the ALJ's decision, the daily activities Plaintiff described to Dr. Boerger were more limited than the ALJ recognized.  Plaintiff,

20

for instance, reported that she managed money "with the assistance of her husband" (*PageID#* 268); she further reported that "her only visitor was her son who is coming for a couple of weeks." *Id*.  Although Plaintiff reported that she "does get along with people in stores," *id*., there is no further information about this ability.  Such information is needed because shopping in stores is not generally a social activity, it usually involves minimal communication with others, and Plaintiff reported to Dr. Boerger that "she has no problem in stores as long as she gets in and out quickly." *Id*.

The ALJ next placed great weight on the opinions of Drs. Greene, Semmelman, and Boerger based on Plaintiff's moderate GAF scores.  This is too slender a reed to support the great weight the ALJ placed on the non-treating sources' opinions.  Before the ALJ issued his decision, the Sixth Circuit Court of Appeals explained:  "[A] GAF score is 'a subjective determination that represents the clinician's judgment of the individual's overall level of functioning.'  A GAF score is thus not dispositive of anything in and of itself, but rather only significant to the extent that it elucidates an individual's underlying mental issues."  *Oliver v. Comm'r of Soc. Sec.,* 415 F. App'x 681, 684, 2011 WL 924688 (6th Cir. 2011) (quoting, in part, *White v. Comm'r of Soc. Sec*., 572 F.3d 272, 276 (6th Cir. 2009)).  The Sixth Circuit also noted parenthetically,"The GAF scale ... does not have a direct correlation to the severity requirements in our mental disorders listings." *Oliver*,  415 F. App'x at 684 (quoting, 65 Fed. Reg. 50746, 50764 (2000)).  In addition, Dr. Boerger indicated that his assessment of Plaintiff's GAF was for the "Current" period,

which without further specificity, provides little insight into Plaintiff's mental work abilities or limits.  *See id*. (and citations therein).

As to Dr. Green's opinions, the ALJ failed to recognize that at the time of her record review, the administrative record contained only two pages of Plaintiff's medical records that referenced her physical condition after her asserted date of disability onset. Plaintiff correctly points out, "For reasons unclear in the record, the state agency never sent Plaintiff for a physical examination."  (Doc. #8, *PageID*## 425-26).  As to Dr. Semmelman, she reviewed the record before Plaintiff began mental-health treatment, leaving the record void of any mental health treatment notes.  In light of the limited records these non-treating medical sources reviewed, the ALJ's decision to credit their opinions – their experience in evaluating social security claimant functional limits (*PageID*# 50) – does not by itself support the great and dispositive weight the ALJ gave their opinions.  Although the ALJ appears to have recognized the limited records available to Drs. Greene and Semmelman, he minimized this problem by relying on the lack of change in her daily activities, her treatment history, and her GAF scores. (*PageID*# 50).  The ALJ again erred, however, by relying on her daily activities and GAF scores, for the reasons stated previously.  As to Plaintiff's treatment history, that is the point – they did not have the later information about Plaintiff's "treatment history" when they formed their opinions.  And, the ALJ did not rely on any medical source opinion – no medical expert testified at the ALJ's hearing – to support this reason.  *Cf. Hollins v.*

*Astrue*, 780 F. Supp.2d 530, 536 (E.D. Ky. 2011) ("Thus, neither reviewer saw a complete record.  Therefore, the ALJ could not rely upon the opinions of the reviewers to offset the opinion of the treating source and a remand of the action for further consideration is required.").

The ALJ's reasons for rejecting the opinions provided by Plaintiffs' long-term treating medical sources, Drs. Thuney and Dahar, are likewise unsupported by substantial evidence.  As to both treaters, the ALJ again relied on his flawed consideration of Plaintiff's daily activities as a reason for rejecting their opinions.  (*PageID*# 51).  Again, substantial evidence does not support this reason.

Dr. Thuney has been Plaintiff's primary care provider since at least 1999.  The evidence in the administrative record regarding Plaintiff's physical health since her alleged onset date was generated by Dr. Thuney.  (*PageID*## 248-49, 298, 301, 308, 341-42, 384).  Dr. Thuney's notes reveal that he examined Plaintiff as part of nearly every contemporary office visit.  *See PageID*## 248-49, 298, 08).  Dr. Dahar is a relevant specialist who has been Plaintiff's treating psychiatrist since October 2011.  *(PageID*## 361-66, 355-56, & 398-99).  He has had the opportunity to evaluate Plaintiff's mental health in person on multiple occasions, has managed her psychiatric medications, and has generally directed her mental health treatment for the months before Plaintiff's administrative hearing.  *Id*.

The ALJ decision to place little weight on these treating source's opinions are

contrary to the Commissioner's regulations and not supported by substantial evidence in the case record.  This is largely because what few reasons the ALJ gives for discounting this compelling treating source evidence are inaccurate or otherwise insufficient to sustain his premise that these opinions merit "little weight."  As to Dr. Thuney's opinions, the ALJ rejects Dr. Thuney's references to Plaintiff's fibromyalgia.  The ALJ reasons that because Dr. Thuney added fibromyalgia "as a diagnosis in February 2010" and because rheumatologist Dr. Schreiber "specifically did not diagnose fibromyalgia," Dr. Thuney's reference to this condition in his opinions renders his conclusions non-persuasive. (*PageID#* 51) (*citing PageID*## 248, 253).  The problem here is that both of these observations about the contents of the record are inaccurate.  Dr. Thuney's treatment records reflect a diagnosis of fibromyalgia as early as August of 2008 and into 2009.  *See PageID*## 251, 309-11.  Given this, the ALJ's supposition that Dr. Thuney simply diagnosed fibromyalgia for the purpose of Plaintiff's disability claim is then directly contradicted by the evidence.

The ALJ's characterization of the report of rheumatologist Dr. Schreiber as disproving Dr. Thuney's fibromyalgia diagnosis is similarly inaccurate and misleading. Dr. Schreiber wrote, "I do suspect functional component to her symptoms (fibromyalgia syndrome)."  (Tr. 253).  The ALJ's principal challenges to Dr. Thuney's opinion are thus unsupported by even a cursory review of the record's evidence.

Lastly, the ALJ's assertion that Dr. Thuney's opinion is somehow inconsistent

24

with Plaintiff's early 2009 medical imaging (*PageID* # 51) is lacking in at least 2 respects. First, this evidence well predates both Plaintiff's alleged onset of disability date and Dr. Thuney's opinions. Second, there is no reason to believe that Dr. Thuney's opinion was premised upon orthopedic degeneration or Plaintiff's lumbar spinal deterioration. Rather, Dr. Thuney's treatment notes and his opinion largely center upon fibromyalgia/polyarthralgia, impairments which would not be expected to manifest on a bone scan or MRI. (*PageID* ## 248-49, 298, 301, 308, 341-42, 384).

Similar fault exists in the reasons the ALJ provides for rejecting the opinion of treating psychiatrist Dr. Dahar. (*PageID* # 51). The ALJ found that Dr. Dahar's opinions are rightly discredited as they are inconsistent with the results of the psychiatrists "first and only psychiatric evaluation of the claimant in October 2011…" *Id*. However, Dr. Dahar treated and evaluated Plaintiff's mental health in both November 2011 and February 2012. (*PageID* ## 355-56, 398-99). Additionally, the ALJ stops well short of identifying the portions of Dr. Dahar's evaluation, outside of the assigned GAF score, that are inconsistent with his opinions. In fact, outside the GAF scores, the ALJ fails to point to any mental health treatment evidence inconsistent with Dr. Dahar's conclusions. *Id*. The ALJ's reliance on GAF scores to discredit Dr. Dahar's opinion fails to substantiate his weighing of this treating source evidence in multiple respects. First, there is no meaningful inconsistency between the GAF scores in Plaintiff's mental health records and the GAF score of 55 reflected in Dr. Dahar's opinion. *See PageID* ## 269, 304, 363,

390 (reflecting GAF scores of 57, 53, 55, respectively).  Second, the ALJ's

characterization of a GAF score of 55 as "substantially inconsistent" with Dr. Dahar's

identification of marked or severe limitations represents a misunderstanding of the

significance of GAF scores for the purpose of determinating eligibility for benefits under

the Social Security Act.

Accordingly, Plaintiff's contentions regarding the ALJ's evaluation of the medical

source opinions of record are well taken.[4]

### D.    Remand is Warranted

If the ALJ failed to apply the correct legal standards or his factual conclusions are

not supported by substantial evidence, the Court must decide whether to remand the case

for rehearing or to reverse and order an award of benefits.  Under Sentence Four of  42

U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's

decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*,

501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous

principle of law, failed to consider certain evidence, failed to consider the combined

effect of impairments, or failed to make a credibility finding.  *Faucher v. Secretary of

H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the

evidence of disability is not overwhelming and because the evidence of a disability is not

---

[4] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's challenge to the ALJ's hypothetical question to the vocational expert is unnecessary.

26

strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176.

Plaintiff, however, is entitled to an Order remanding this matter to the Social

Security Administration pursuant to Sentence Four of §405(g) due to problems set forth

above. On remand the ALJ should be directed to (1) evaluate Plaintiff's credibility, the

medical source opinions, and the other evidence of record under the legal criteria set forth

in the Commissioner's Regulations and Rulings and as mandated by case law; and (2)

review Plaintiff's disability claim under the required five-step sequential analysis to

determine anew whether she was under a disability and thus eligible for Disability

Insurance Benefits.

**IT IS THEREFORE RECOMMENDED THAT:**

1.      The Commissioner's non-disability finding be vacated;

2.      No finding be made as to whether Plaintiff Karen Barnett was under a "disability" within the meaning of the Social Security Act;

3.      This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4.      The case be terminated on the docket of this Court.

February 4, 2015

_____s/Sharon L. Ovington_____
Sharon L. Ovington
Chief United States Magistrate Judge

### NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen (17) days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See, United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).